UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------x
OPERA SOLUTIONS, LLC,                   :
                                        :
                    Plaintiff,          :    16-CV-02239-JPO
                                        :
        -against-                       :
                                        :
STEVE GOLD,                             :
                                        :
                                        :
                    Defendant.          :
-------------------------------------------------------x

## SUBSTITUTED COMPLAINT
## AND DEMAND FOR JURY TRIAL

Plaintiff Opera Solutions, LLC ("Opera" or "Plaintiff"), by its attorneys, brings this complaint against defendant Steve Gold ("Gold" or "Defendant') (together, the "Parties") seeking damages for breaches of Defendant's employment contract and non-disclosure agreement with Plaintiff and Defendant's breach of fiduciary duty.

## PARTIES

1. Plaintiff Opera Solutions, LLC, is a Delaware Limited Liability Company registered as a foreign limited liability company in the State of New York and with a principal place of business at 10 Exchange Place, 11th Floor, Jersey City, New Jersey 07302. Opera, a global leader in data analytics and data science, has offices in several locations in the United States as well as offices in China, Great Britain, Austria and India and provides its products and services on a global basis to many of the world's leading companies. The members of Opera are domiciled in, have their principal place of business in, and/or were formed under the laws of the states of Alaska, California, Connecticut, Colorado, Delaware, Massachusetts, New York, New

1

Jersey, Pennsylvania, and Washington, and in India. None of Opera's members are a citizen of Illinois.

2. Defendant Steve Gold is a resident of Illinois, residing at 135 Rock Gate Lane, Glencoe, Illinois 60022. Mr. Gold served as Executive Vice President, Enterprise Solutions for Opera from October 8, 2012 to his termination on December 30, 2013. Since 2014 Gold has been a principal of Deloitte LLP and Deloitte Consulting LLP.

## VENUE AND JURISDICTION

3. This Court has jurisdiction under 28 U.S.C. § 1332 based on diversity of citizenship of the parties. The amount in controversy exceeds $75,000.

4. Venue in the Southern District of New York is proper pursuant to 28 U.S.C. Section 1391 because (a) the Defendant resides in Glencoe, Illinois, (2) several of the actions about which Plaintiff complains originate, occur and/or are connected to New York, New York, and (3) Opera and Gold are parties to a non-disclosure agreement in which they specify that the exclusive jurisdiction and venue with respect to any action shall be in the state or federal courts in New York, New York.

## FACTS

5. Opera is a global leader in data analytics and data science and competes for employees and customers on a global basis. The competition in the world of data analytics and "Big Data" for both customers and qualified employees, including data scientists and other highly educated and skilled talent, is fierce. These customer and personnel relationships are hard-won, usually after many contacts. They sometimes take years to acquire.

6. In October of 2012, after several months of negotiations Gold was hired as an Executive Vice President of Opera pursuant to an Employment Agreement. Gold's primary

responsibility was to manage Opera's Enterprise Solutions Group. In this position, Gold was responsible for knowing, amassing and safeguarding detailed and sensitive information about Opera, its services, products, business strategies, pricing and its network of customers and employees across the globe. Gold's terms of employment provided for, among other compensation and benefits, an annual base salary of $300,000 for his services.

7. As part of his hiring process, Gold and Opera negotiated an "Employee Non-Disclosure, Proprietary Rights and Non-Competition Agreement" (the "Non-Disclosure Agreement") and "Employment Agreement" (the "Employment Agreement"). Gold was represented by highly competent counsel in connection with the negotiation of the Non-Disclosure Agreement and the Employment Agreement.

8. In consideration and as a material condition of his employment, Gold and Opera entered into the Non-Disclosure Agreement on October 8, 2012 shortly before the date he started employment with Opera. The Employment Agreement also had an effective date of October 8, 2012.

9. Paragraph 1 of the Non-Disclosure Agreement provides in relevant part that:

> Employee hereby acknowledges that he will have access to and will participate in the development of or be acquainted with confidential or proprietary information and trade secrets related to the business of the Company … including but not limited to: …customer lists, claims histories, adjustment and settlements and related records and compilations of information, the identity, lists or descriptions of any current, past or prospective clients or customers, referral sources or suppliers, financial statements, marketing plans, initiatives, proposals, presentations and related materials; cost reports and other financial information…The Information and trade secrets relating to the business of the Company or its Affiliates described hereinabove (including Third Party Information) in this paragraph are hereinafter referred to collectively as the "Confidential Information"

\* \* \* \* \* \*

ME1 22245266v.1

> Either during or after the term of Employee's employment with the Company, Employee shall not disclose, use or make known for his or another's benefit any Confidential Information or use such Confidential Information in any way except as is in the best interests of the Company or its Affiliates in the performance of Employee's duties or services.

10. Paragraph 2 of the Non-Disclosure Agreement provides in relevant part:

    > During the period of time Employee performs services as an employee of the Company and for one (1) year after termination of such relationship with the Company for any reason whatsoever (the "Restricted Period"), Employee shall not either individually or on behalf of or through any other person, business, enterprise or entity, directly or indirectly, (a) solicit, encourage or persuade any employee or consultant of the Company to terminate his or her relationship with the Company; (b) hire or retain or attempt to hire or retain any employee or consultant of the Company; (c) solicit or encourage any employee or consultant of the Company to become an employee or consultant of another business, enterprise or entity; (d) solicit, divert or appropriate or attempt to solicit, divert or appropriate the business of any customer, client or contractual partner of the Company; (e) encourage, persuade or entice any customer, client or contractual partner of the Company to sever, terminate, reduce or decrease the scope of its business relationship with the Company; (f) interfere with or disrupt the relationship between the Company and any of its employees, consultants, clients, customers or contractual partners; or (g) provide services for, whether as a consultant, agent, contractor, employee, officer, partner or owner, any client or customer of the Company.

11. Paragraph 3 of the Non-Disclosure Agreement provides in relevant part that:

    > During the period of time Employee performs services as an employee of the Company and for six (6) months after termination of such relationship with the Company for any reason whatsoever, without prior written consent of the Company, Employee will not directly or indirectly (as an owner, shareholder, principal, member, director, officer, executive employee, manager, consultant, independent contractor, advisor or otherwise) engage in competition with, or own any interest in, perform any services for, participate in or be connected with any business or organization which engages in direct competition with the services offered or the products provided by the Company or any of its Affiliates…

12. Paragraph 4 of the Employment Agreement provides in relevant part that:

    > The Employee shall devote substantially all of his business time and attention to the business of opera Solutions during the period of his employment and shall not, during such period, be engaged in any other business activity, whether or not such business activity is pursued for gain, profit or other pecuniary or non-pecuniary advantage or purpose . . . While

4

the Employee renders services to Opera Solutions, he agrees not to assist any person or organization in competing with the Company, in preparing to compete with the Company or otherwise engage in any activity that represents a conflict of interest with his role as an executive of Opera Solutions.

13. On December 30, 2013, Opera Solutions Chief Legal Officer sent Gold a termination letter and the parties began the process of restructuring Gold's Employment Agreement.

14. In connection with restructuring Gold's Employment Agreement, the parties entered into a Standstill Agreement to facilitate further discussion.

15. While the Standstill Agreement was in effect, Opera discovered that Gold had been actively negotiating new employment and business opportunities with direct and potential competitors of Opera, including direct competitor Deloitte, LLP and Deloitte Consulting, LLP (collectively "Deloitte"), and soliciting Opera's key employees to join him at Deloitte or the other opportunities he was exploring.

16. In fact, as early as October, 2013, while he was still serving as Executive Vice President for Opera, Gold engaged in extensive communication with representatives of Deloitte regarding potential employment opportunities.

17. In his communications with Deloitte, Gold discussed bringing a team of Opera's employees to Deloitte with him.

18. In his communications with Deloitte, Gold also disclosed Opera's confidential and proprietary information, including sensitive financial and other business information.

19. On or about January 24, 2014, Deloitte made an offer of employment to Gold.

20. Gold was hired by Deloitte soon thereafter.

## COUNT I
## BREACH OF CONTRACT

21. The allegations in Paragraphs 1 through 20 of the Complaint are incorporated herein by reference as if fully set forth herein.

22. The Non-Disclosure Agreement executed by Gold is a valid and binding contract.

23. The provisions of the Non-Disclosure Agreement barred Gold from disclosing Opera's confidential information except in the best interests of the Company.

24. After signing the Non-Disclosure Agreement, Gold divulged and used Opera's confidential proprietary information for his benefit.

25. The provisions of the Non-Disclosure Agreement further barred Gold from soliciting or diverting Opera's employees to work for a competitor.

26. After signing the Non-Disclosure Agreement, Gold solicited Opera's employees to terminate their employment with Opera and to become employees or consultants of Deloitte, a direct competitor.

27. The provisions of the Non-Disclosure Agreement further barred Gold from competing with Opera during the period in which he performed services for the Company and for six months after the termination of his relationship with Opera.

28. Opera performed all of its obligations under the Employment Agreement and Non-Disclosure Agreement.

29. After signing the Non-Disclosure Agreement, while he was still employed by and under contract with Opera as well as after his termination, Gold engaged in direct and indirect competition with Opera by providing confidential information to Opera's direct competitor and by soliciting key Opera employees to defect to Deloitte.

ME1 22245266v.1

30. Gold's conduct constitutes an incurable breach of the Non-Disclosure Agreement and has caused Opera to suffer damages as a direct result of those breaches, which include, but are not limited to, compensatory damages, lost profits, and attorneys' fees.

## COUNT II
## BREACH OF FIDUCIARY DUTY/ FAITHLESS SERVANT

31. The allegations in Paragraphs 1 through 20 of the Complaint are incorporated herein by reference as if fully set forth herein.

32. In his role as Executive Vice President of Opera Solutions, LLC, Gold held a position of trust and confidence and owed a fiduciary duty to protect Opera's business, proprietary information, and trade secrets.

33. In his role as Executive Vice President of Opera Solutions, LLC, Gold owed a fiduciary duty to only act in Opera's best interests, including not to divert company employees, consultants, or customers to competitors, including himself.

34. Gold breached his fiduciary duties to Opera Solutions, LLC by, without limitation, divulging Opera's proprietary information and trade secrets, soliciting Opera's employees to defect to Deloitte with him and to directly and indirectly compete with Opera.

**WHEREFORE**, Plaintiff Opera Solutions, LLC demands judgment against Defendant Gold as follows:

a. An accounting of the monies obtained through Defendant's wrongful acts;

b. Forfeiture of the compensation obtained by Defendant from Plaintiff during the period of Defendant's wrongful acts;

c. Lost profits;

d. Compensatory damages;

e. Punitive damages;

f. Attorneys' fees;

g. Costs; and

h. Such other and further relief as the Court may deem just, equitable and proper.

Dated: Hartford, Connecticut
March 29, 2016

Respectfully submitted,
MCCARTER & ENGLISH, LLP

By: */s/ Eric W. Wiechmann*
Eric W. Wiechmann (EW4857)
ewiechmann@mccarter.com
Tiffany R. Hubbard (TH1975)
thubbard@mccarter.com
McCarter & English, LLP
185 Asylum St., CityPlace I
Hartford, CT 06103
Tel: 860-275-6700

*Attorneys for the Plaintiff,
Opera Solutions, LLC*

**DEMAND FOR JURY TRIAL**

Plaintiff Opera Solutions, LLC, through its undersigned counsel, demands that the above case shall be tried by a jury.

By: */s/ Eric W. Wiechmann*
    Eric W. Wiechmann (EW4857)
    ewiechmann@mccarter.com
    Tiffany R. Hubbard (TH1975)
    thubbard@mccarter.com
    McCarter & English, LLP
    185 Asylum St., CityPlace I
    Hartford, CT 06103
    Tel: 860-275-6700

    *Attorneys for the Plaintiff,*
    *Opera Solutions, LLC*